Good morning, Your Honors. May it please the Court, my name is Edward Robson and I have the privilege of representing Mr. Kevin Buker today. We're here because Mr. Buker expressed his political views about liberal politics and gun control on his Facebook account. Defendants pressured him to stop. Mr. Buker then made posts about the suppression of First Amendment rights at the county, state and national levels. Other department personnel joined in that dialogue. In response, defendants terminated Mr. Buker and terminated or disciplined the other department personnel who expressed their concerns. Defendants' actions are an affront to the First Amendment and this Court should not validate them. We're asking this Court to determine that all of Mr. Buker's posts involved or embraced a matter of public concern. We're asking the Court to remand this case to the District Court for trial on three issues. On whether there was reasonable apprehension of disruption, whether there was causation and whether there were damages. We're also asking this Court to instruct the District Court to address the merits of Mr. Buker's facial challenge. Now, Mr. Buker brings two claims in this case. First, a retaliation claim and a facial challenge. I'd like to look at the retaliation claim and I'm going to analyze that claim in the way this Court directed in McVeigh. The first prong of McVeigh is to analyze whether the posts embraced a matter of public concern. Mr. Buker's first post. Do you think all three posts embraced a matter of public concern? Yes, I do, Your Honor. All right. I'll let you start with the first one then. Okay. Well, the first one, I'm going to call them the gun control posts. Those are the guns or control. Well, it doesn't specifically, but there's evidence in the record that defendants understood it to mean gun control or defendants' witnesses understood it about gun control. And more importantly, the District Court held that it was about gun control and there's no cross appeal on that issue. That issue is not before the Court. So, it doesn't specifically mention that, but the District Court held that and defendants' witnesses concede that as well. Okay. So, assume it's about gun control as a matter of public concern. The second prong is whether the matter of public concern is outweighed by the Department's interest in How does talking about killing liberals and even better yet, black liberals from a commander of the fire department ever get beyond prong two? So, let me address that. I would imagine and indeed was pretty disruptive to your client's colleagues. So, there's a few pieces in there. Let me break that down. At the outset, the notion concerning the courts may be misconstruing that first post. Mr. Buecher is not saying kill black liberals. He's making a comment about the proposed assault weapons ban. We have an expert report that explains sort of the satire in there. I don't think it's obvious on its face. I'll make the specific comment again. I read that argument. I'm trying to get my arms around your argument on that point there. On the meaning of the first post? Think of the satisfaction of beating a liberal to death with another liberal. It's almost poetic. And then a co-worker responded in part, oh, pick a black one. Those are more than enough. I do note that this was posted on January 20th, 2013, which I believe was the day before President Obama was inaugurated for the second time. So, I'm surprised the Secret Service didn't come call him. So, I think we have to read the full post. So, it says, my aide had an outstanding idea. Let's all kill someone with a liberal. Then maybe we can get them outlawed too. This is not guns that are the problem. It's people using the guns. Think of the satisfaction of beating a liberal to death with another liberal. It's almost poetic. Now, Mr. Grutzmacher, this is the follow-up comment. He says, but was it an assault liberal? And he puts that in quotes. He's referring to the assault weapons ban. Better pick, got to pick a fat one. Those are the high-capacity ones. Again, referring to the proposed legislation that would categorize assault weapons on the basis of magazine capacity. Then he says, oh, pick a black one. Those are more scary. Had to perfect an employee. I go back to the second prong again, the disruption. I'm going to assume that was a matter of public concern. How is that not disruptive to the organization when one of its leadership, he was a battalion commander, right? Yes, ma'am. Is referencing, even in satire, killing liberals, fat ones, black ones, how is that not disruptive? It was, in fact, disruptive. Well, let me address that in a few ways. So first of all, with respect to the factual issue as to whether there was disruption, defendants present no evidence of disruption. And it's very clear from Dorham, Goldstein, that they have to put evidence on the scale. What they're hanging their hat on is this notion of reasonable apprehension of disruption. And what they're putting on the scale is basically gossip. There are some concerns about people saying, well, I might not want to work for Mr. Buecher in the future. And that's not enough to tip the balance. With respect to his position as a higher-level commander, that doesn't circumvent the requirement that the court perform a balancing. I mean, it's almost as if the district court is saying, well, he's a high-level guy. That's a shortcut. We don't have to do the balancing. There must be disruption because he's a higher-level guy. And that's not the case. Defendants still must put forth evidence on the scale. And it's got to be more than lip service. More than that, there's a legal issue. This court in Berger, I should, let me step back. This court treats speech related to the workplace different from speech that is totally unrelated to the workplace. This speech, the first post, is completely unrelated to the workplace. It has to do with gun control. It has to do with liberals. And the appropriate standard that this court's adopted is Berger. In Berger, you had a police officer performing an Al Jolston routine. Was he a supervisor? Was the police officer a supervisor? I don't believe he was, Your Honor. Was he a chief? I don't believe he was. Or was this defendant in a position such as that? As a Supervisor, or was he in a chief type of position? He was at the lower level of the upper management. I mean, he was upper middle. What was his title? He was a battalion chief, Your Honor. Battalion chief. Yes. Isn't that different from Berger? Well One thing for an employee who doesn't supervise anyone, the factors that I want to hear you talk about are the rich factors. I'm sorry. The factors that weigh, at least in terms of the balancing, this court has already spoken on this, in terms of what factors one ought to consider when balancing the interests here on a First Amendment basis, particularly when it involves an employee. And there's a list of factors there that rich factors, specifically talks about. Well, and I understand Your Honor's point. I mean, his upper level position is important. And it does suggest that there's more of a possibility of disruption for sure. But it's not, it doesn't circumvent the disruption analysis. They still need to put evidence on the scale that there was disruption. With respect to Your Honor's reference to Berger, you're correct. He was not in a supervisory role. I really would rather you talk about the rich seven factors there that we talked about. Okay. Are you familiar with those factors? I'm familiar with them, yeah. I mean, but I'm not sure, I mean, yes, I'm familiar with them. I mean, what, you know, Mr. The balancing test that requires us to consider the context in which this speech is made. Correct. We try to make these things easy. So the First Amendment and free speech are not easy cases. I'll tell you that right now. They go back and forth. You've got that going in your favor there. But we, in that particular case, wanted to try to say, well, when we got an employee speech, we look at certain things. And here you have a supervisor, or at least someone in that type of role. And these factors lay out the kinds of things we need to consider. Yes, I agree. And I guess my, when we go through that analysis, I think defendants, the evidence they put on the scale falls short. And all of these are going towards the District Court's determination that the second problem at bay is the problem is just that that's pointed out here. That even if we can get beyond the first one, it's the second problem that that's the problem in terms of discipline. Does it impair the ability to discipline those under him? Does it impair harmony with the other workers? That sort of thing there. And the Court made the determination that yes, it does. I understand the District Court made that determination. But this Court made very clear in Dorham that the kind of unsubstantiated predictions of disruption that defendants are making is not enough to tilt the balance. And this Court was very clear in Stroman that these predictions of disruption have to be fairly specific. They have to be aimed at a particular expectation of a particular instance of disruption. In Stroman... I'm trying to figure this out because we have to sort through these things. Isn't it different when you're talking about a supervisor or someone who's in a position of leadership or responsibility than you are someone who's like an entry-level person or day-to-day person? I mean, in terms... I'm thinking in terms of the fire department, police department, any other governmental entity, that if you have your police chief, for instance, putting this on Facebook, that's a lot different than the guy who walks the beat down there, solving his little statements off. That happens all the time. But the police chief, the city, or the county, you would think, you would understand there are certain things you just can't do because there are others who look to you for guidance. I think that that goes into the analysis. I don't think it's dispositive. I don't think that it's somehow a shortcut around the defendant's obligation to show disruption, which they can see there's no actual disruption, or reasonable apprehension. Disruption and the type of discipline that it can impair is much different when you're in that kind of a role than if you don't have anybody under you. You just come to work, and you work hourly, and you go home. There's a whole different ballgame there. I mean, that happens all the time. But when you're in a chief position, a battalion chief position, you're putting this stuff on Facebook, and you've got all these people looking at you, and you're using comments, in this instance, one way or the other could be to interpret you talking about black people. I'm not sure. I got your argument that that's what he was not talking about. It certainly looks like that's what he was saying. He liked it, I guess. He didn't really say it. I don't think he said it. I just don't get why. First of all, I don't know why he would keep doing it. I know he's got a First Amendment, but why would he even do that as a battalion chief? That I don't have an answer to, Your Honor. Well, except that he was aware of his First Amendment rights, and he felt that he was expressing himself on gun control and liberal politics, and he felt that he was being subject to an unconstitutional social media policy and code of conduct. And he says, hey, guys, my Facebook community, my First Amendment rights are being infringed. Look at this county policy. It's indicative of a national trend from what he perceives to be, you know, liberal politicians. I know you're talking about the second and third posts, right? I am. And the way you're describing those even, those two are not, can't be matters of public concern. He's talking about something that is of personal interest to him. The investigation against him and the way in which that policy is being implemented against him. And that's certainly the district court's reasoning, and I don't agree with that. And the reason I don't agree with that is because what's missing in that is what Mr. Buecher is doing is he's using himself as an example of a larger policy. I mean, when he says, you know, if you look at those posts, it says, well, you know, all the county, state, and federal positions are liberal Democrat held. Free speech only applies to liberals. And look, the county has, is following this, you know, liberal trend of suppressing free speech. So he sort of starts at this, you know, national level and says, look, I am a victim of this larger tide, this larger flow. So in that respect, I don't think that it's a personal grievance. There's a distinction there. And of course, this court's recognized, though, that just because an employee suffers the effects of a larger policy doesn't somehow, or suffers the effects more profoundly than other particular, you know, other employees, that doesn't somehow convert a matter of public concern to a private grievance. And this court in Durham was clear about that. They say, you know, the fact that... Didn't you say there's no evidence of disruption? Right. What about the February 17th post that was incited by the initial post? The February 17th post was made by an appellant's friend who worked for a different fire department, posted a photograph of a woman with her middle finger raised and said, this page, the one you're looking at, it's mine, and I'll post whatever I want. And for you, Chief. Right. For the initial poster. I mean, that's within the fire department ranks. How is that not an actual disruption? It's not an actual disruption because it doesn't affect... Or even a reasonable possibility of disruption. Well, it's not an actual disruption because it doesn't affect the core mission of the department. It's not a reasonable apprehension because there's nothing specific that it would affect the operations of the department. You don't need an actual disruption. Your Honor, I see my time's up. That's right, Your Honor, but it's reasonable apprehension. Good morning, Your Honors. Good morning. May it please the Court. Cynthia Peltzman on behalf of the County Defendants. The Court has made many of the points that I wanted to make as far as the retaliation claim. I just want to then make a couple of additional points. First of all, as far as the January 20th post, I want to point out that this Court in Cromer v. Brown in 1996 said specifically that allegations of racial discrimination in a law enforcement agency are matters of serious public import. Obviously, this is a fire department. They're a bit different, but still the same rank and file, you know, command structure. So you're reading that statement regarding the black as being definitely about race, whereas the other side said it's not. It was certainly perceived that way by some people in the department. For instance, the complaints to the battalion chief who was the president of the Phoenix Sentinels, the African American Firefighters Association. So the point is that if evidence of discrimination in an organization like this is of critical public importance to the public, it just seems to me that, you know, obviously if you have a high-level commander who is publishing a statement that could be and certainly was in some instances seen as racist, then the department can do something about that, particularly where it did nothing more than say, hey, you need to take this down. As far... I also want to point out... That's all that they initially did. Pardon me? That's all that they initially did. That's all that they initially... And then they took it down. Yes, Your Honor, that's correct. In fact, it wasn't even targeted this post. What they said is take a look at your post and take down anything you believe would violate the social media policy. I'm sorry, Judge. But isn't that the essence of the capital punishment for persons who wish to express themselves to take it down? I mean, that's the same thing as shut up. Stop talking. I mean, isn't that capital punishment, what we call... Isn't that the ultimate? Well, I think what's important in this case is that Mr. Buecher never in any instance either alleged or put forth any evidence in the case that he suffered any injury whatsoever from that. For instance, that his rights were chilled by that request that he take that down. And I think certainly subjectively, you can say his rights weren't chilled because he kept posting, culminating with the February 17th post. As far as... You're opposing counsel. Let's assume the post was a matter of public concern. I could see how someone might say that. Assume that. Your opponent also said that you do not have sufficient evidence of a reasonable prediction of disruption in the workplace. What is your evidence of disruption in the workplace? Well, there was certainly evidence that it was more than just mere gossip. This was like the talk of the fire department, primarily because Mr. Buecher was known as a disciplinarian. You have this fairly new social media policy and everybody's saying, oh, my gosh, look at this. He's posting, you know, about this. What's going to happen? Is this going to raise a double standard? Why does he get to post, you know, something like this clearly or potentially in violation of a policy and yet he's going to come down on us for doing that? They were taking screenshots. They were texting screenshots for ammunition in the event that he did come back at them. And certainly, again, once the racist part of the post, which happened pretty quickly, once that happened, I think it was that just escalated it even more. I also want to point out that Mr. Buecher relies on Berger, but Berger was decided prior to the Supreme Court's decision in Roe v. City of San Diego. And in that case, or I'm sorry, City of San Diego v. Roe. And in that case, the Supreme Court made clear that even if you have speech that is really aside from your job in the department, if it can have a detrimental impact on the operations, which the Supreme Court found that the speech in Roe did, then it, you know, is considered to be disruptive. If an individual makes a post that could be reasonably interpreted by some people to refer to to be racist, but in fact the person believes it was not ever intended to be that, nor does it believe it, does that matter? I think that the intent perhaps plays some small role. But number one, the case law is clear that content is the most important. And we have cases, for instance, in Stroman. They didn't necessarily look to see what was his intent in sending that letter, how many people saw it. It was just the nature of the language itself. So I think, again, it's part of the context, but the content inquiry, I think, outweighs that. Does this case turn and fall on the second prong of McVeigh? I, well, I think it does in the sense because as Judge Thacker pointed out, the biggest example of disruption here is that after the January 23rd post where people are interpreting that as Mr. Buecher getting into a fight with his boss. He's not happy with something that his boss told him to do. He's publicly, you know, getting into a fight that a rank-and-file firefighter felt free to choose sides here and say, yeah, in this fight that you're having with the fire department over Facebook, I'm taking your side, and frankly, I don't care what you tell me to do because I'm going to do whatever I want. That's pretty big disruption in a paramilitary organization like the fire department. If a black battalion chief posted and said, yes, black lives do matter, would that violate the policy? I think it's so fact-specific, you'd have to look at the reaction in the agency, for instance, here, what would happen, I think potentially, but I think it's such a fact-specific inquiry. You're saying that almost everything is thrown up to what the reactions of someone else, that's the whole idea of the true definition of freedom is not to do what you want but to not to do what's expected. I mean, it's supposed to be an irritant. I mean, that's why our framework said  you don't need the Constitution. You need the Constitution when people don't agree with you. That's the whole purpose, but you're telling me everything is, well, it depends on how people react to it. I can bet you a dollar to donuts there'll be a panoply of reaction to if the chief said black lives do matter. Some people say, I agree with that. Is that the standard? It's the standard, not in the sense of, for instance, like the court talked about in Berger v. Battaglia where you have this outside determination by citizens, oh, gee, we find that speech offensive, but reaction in the sense of how it has a real effect on the agency itself, if it's going to cause divisiveness. That statement you think would. You think if a black battalion chief said that that would cause disruption? Would that cause disruption in a paramilitary organization? I see that post as different from what was here. What was concerning here was really the violence. It's antithetical to someone whose job is to save lives to say, wouldn't it be funny and wouldn't I get a lot of satisfaction out of seeing somebody be beaten to death. People have different takes, but it seemed to me the take was a play on the whole idea of the premise that guns don't kill people. People kill people. Then what you're doing, you're taking the analogy to say, okay, let's make people kill people. The analogy is the people are the weapons. Let's kill somebody with a liberal, meaning the person is killing somebody with the person. That seems like what he was talking about since Jonathan Swift. Satire has always been a part of literature and it changed things for the good, but I'm just wondering, it's not a question whether you like what someone is saying, it's whether or not it is a curtailment of the most precious freedom we have in our country that is the right to speak. It's so easy to say if somebody disagrees with them, say I'm jumping on a bandwagon, but the question is where are the contours? You keep telling me if someone doesn't like it, if it's disruptive. You mean to tell me if it was okay if someone said, nobody said, I didn't even see the post. It was totally non-disruptive. It would be okay then or it would still be a violation? Get in the context of public employment, whether it's disruptive to the agency. As far as, yes, certainly if it was citizen speech, that's different from employment speech where the employer has a greater ability to restrict the employee's speech. If it's reasonably apprehended that it's going to be disruptive, that it's going to be divisive, that it's going to cause problems with people working together in the agency, that it's going to cause questions about a double standard, if it's going to cause problems with if this is the person who's supposed to enforce a policy and sell the policy and they're publicly denigrating it, then again, that's a different situation than talking about the speech, just curtailing somebody's speech because they don't like it. And I'm not trying to suggest anything other than what's clear from Connick and Pickering that there really has to be a disruptive effect on the agency. This is not like the case in Durham v. Jones. In that case, the sheriff basically, he was asked... It doesn't have to be an actual disruptive effect. There has to be a reasonable apprehension of disruption. That's correct, Your Honor. And the Supreme Court has said we're to give substantial weight to government employers' reasonable prediction of disruption. And particularly in an organization like Fire Department, Police Department, where it's paramilitary, where discipline and the chain of command is so important. And in the Fire Department, people live together, 24-hour shifts, they have to work together, and something like this could obviously be very disruptive. As far as... Let me ask you this question. Was this battalion chief disciplined on the basis of those code of conduct and social media policy that you had in place? Yes, those were cited in the charges of dismissal. What the record shows is that his termination resulted from insubordination. That, in fact, there wasn't... In the absence of that policy, would he have been disciplined? I think he would have in this particular case, particularly when you get to the February 17th post. There was actually an earlier incident in the Fire Department that's where there was a lynching that was create... Like a parody of a lynching created with beer bottles, a brown beer bottle that was hung from a shelf in the refrigerator surrounded by white beer bottles with cones. And that, the department... That was a volunteer firefighter. The department terminated him from operations. They couldn't obviously terminate him from... But they did say no operations. And I believe in that case, that was an assistant chief also. Something like that. We don't have to address the facial challenge because you've now gotten rid of those policies. That's correct, Your Honor. And I also want to point out that as I don't even think... We obviously get into the voluntary cessation issue. I'm not even sure that the court really needs to address that because once the district court determined that there was no injury because there was no protected speech, then basically there's no basis for even the third-party claim that the district court treated that was still alive. The court recognized there was no injury claimed in this case except the termination. So the facial challenge as far as Mr. Buecher's independent facial challenge, I was harmed by this policy that that was extinguished. But under Lujan, under Covenant Media, etc., when you have to have an injury in fact to support even a third-party claim. So for the same reasons that the court determined that Mr. Buecher's independent facial challenge was extinguished once that there was a termination of no injury, the same could be said of the third-party claim. So I don't even know that the court would have to reach the voluntary cessation issue. And I will say that this court's precedent for the voluntary cessation doctrine is a bit back and forth. The district court relied on Rock for Life v. Hrabowski, which... Back and forth, meaning we're not very clear? Not very clear. Because, for instance, in Rise v. City of Lynchburg, that was in 2002, this court, there was a situation where the city repealed a parade permit and then promised we won't ever reenact this again. And without really any analysis, the court says, oh yeah, there's basically no likelihood that this is going to happen. In Rock for Life v. Hrabowski, when it came to this court, this court issued a per curiam opinion. In that case, the court relied on Valero Terrestrial Corporation, which said, well, there's this Supreme Court case, the City of Mesquite v. Aladdin's Castle, but this court has always limited that to its specific facts, where you have an affirmative statement by the defendant that, well, we may still reenact this. And in addition, in that case, in City of Mesquite, that there was also a house history where there had been some changes in the policy. And then finally you get to Wall v. Wade, which is a 2014 case, where in contrast to what the court had done in Rock for Life, said, well, we're going to rely on City Mesquite because the offender is always free to return to the language. So it's kind of unclear. It's going back and forth. In this case, I will say that as Mr. Buecher pointed out in his brief, the changes in the policy, it says that it was adopted  basically it's to conform to recent case law. And I will just point out to the court that in May of 2015, the Eastern District of Virginia, the district court there, issued the case Liverman v. City of Petersburg. Why would the Fire Department care about an Eastern District of Virginia case? Because it was the first case, and I believe still the only case in the United States that has ever addressed a facial challenge to a social media policy. There are certainly lots of cases out there that involve a facial challenge to much broader policies like press policies.  It is, yes. Yes, Your Honor. Pardon me? Do you intend to reenact it? No, Your Honor. And in fact, that's what I was going to point out. If the act is gone, then... But obviously, this court can find that there would be some intent to reenact, or at least the ability to reenact, and that wouldn't be sufficient to move the case. Okay. And then finally, sorry, as far as this case being about gun control, there's really nothing in the record, and I'll point out that this court in Goldstein basically says that this is the employee's burden. This is the plaintiff's burden to choose the causation prong. And if you look, the theory of the case is really, this is trying to limit his or shut down his position on gun control. I'll point out that in the record on page 375 that Mr. Buecher was asked, So who in the county would you be referring to as far as having the position where it was worthy of disciplinary action if you were against gun control? And Mr. Buecher said, I believe what I specifically said was that they could have had that stance. I had no idea. I've got no way of knowing that. So in fact, he has presented, not only has he not presented any evidence, which is his burden to do as far as the causation prong, but he hasn't really even raised any evidence that sufficient to raise, you know, to create a question of fact. I'll also say that, You don't think the post had anything to do with gun control? Pardon me? You don't think the post had anything to do with gun control? No, I'm not saying that whatsoever. I'm saying that his termination didn't have anything to do with gun control. Basically, nobody in the department cared what his position on gun control was. He'd been on Facebook since 2009. As is pointed out in Mr. Buecher's brief, he had a whole series of posts that were at least as caustic as the January 20th post. Nothing ever happened, and yet he had the same Facebook friends. He had members of the fire department management who were his Facebook friends. Nothing happened because nobody really cared about what his position on gun control was. He testified that he had no idea what the positions of the you know, in fact, the person who first reported the January 20th post was the battalion chief on, he was a battalion one battalion chief, whereas Mr. Buecher was battalion two. They were on the same ship. He was a member of the NRA. He was a firearms instructor. He understood the post to be about firearms and gun control but just still didn't believe because of the violence and certainly because of the racism that it was appropriate for the, for a battalion chief to be posting something like that. So, unless the court has any other questions, I would just ask that you affirm the district court. Thank you. To follow up on Judge Gregory's question as to what's the standard or that we're getting into a slippery slope, we asked defendant Goddard, the fire chief, a very similar question. He responded, I think each one is on a case by case basis. Take a look at the totality of the circumstances that surrounded it and to really evaluate the true impact that it has on me as the chief of this department to interact with our community. So, it has to be on a case by case basis. So, I'm the person who ultimately takes a look at the individual violations, takes it in the context of our values within the organization and within the feedback that I received through the years and I'll make a decision based on those factors on a case by case basis. In other words, he's saying I am the state. It's whatever Mr. Goddard says is the bounds of the First Amendment and it is. I want to clean up a few things that Ms. Pelton. I read that the same way you just interpreted it. It sounds like to me he is saying I'm responsible for discipline and good morale around here and for this department. And when things like this happen and I have an interest in it I'm not sure he's saying I'm the boss of everything. He has a job. He's the chief. He has to run the department. He has to maintain discipline and morale and try to avoid what could be interpreted as racist comments in these types of situations. So, I think it's fair to say that about the chief that if they're saying I'm the boss around here so you only got to please me. That's kind of what I tell my law clerk. She only got one job to make me look good. But in the chief's instance, I think that's a different ball game. So, the question was how do you determine what brings disrepute to the department? And he says it's whatever I say it is. It's whatever I say brings disrepute to the department and it is. Because he's the chief and someone needs to make the decision on a case-by-case basis the way that any manager of an organization does. Somebody has to be the leader. Except that when you're talking about First Amendment rights, there has to be clear standards. It can't just be a case-by-case basis. And that's when the courts get involved. But he had to make a decision. You want him to have a list of words you can't say? No. I don't think he'd like that either. Well, I want him to have a standard that's something beyond brings disrepute to the department. Because that's anything. I think the point is that he's saying that's the standard when the courts get involved that it defers to what he says it is. That's what the standard has to be. What is the court's standard when they look at the standard being an individual? These cases, I don't know. Go ahead. To clean up a few things that Ms. Peltzman brought up, defendants, I suppose, are alleging on appeal that somehow Mr. Buecher wasn't ordered to take that first post down. That his supervisor went and asked him to look at a Facebook post. That's not going out in the record. The supervisor himself testified that he ordered him to take the post down. The charges of dismissal say you were ordered to take it down. The investigative report says you were ordered to take it down. So that's inaccurate. With respect to the notion of reasonable apprehension of disruption where we sort of left off on my case in chief, I just want to make clear that although it is a reasonable apprehension of disruption, there is still a factual inquiry. Defendants have to put evidence on the scale of reasonable apprehension. Reasonable apprehension is not just that they think in their own heads that there might be disruption. There has to be something more than that. And Dorham is clear on that, as is Goldstein. And it's just got to be something more specific than gossip. Some things that that was, the complaints by the other firefighters in that February 17th post from another fire department giving the middle finger to the chief. Well, with respect to the complaints from some of the other firefighters, I mean, if you actually parse that out, it's quite weak. First of all, it's hearsay testimony. But even if we were to assume the truth of it, it's saying, well, I might not want to work for Mr. Buecher in the future. It's just not strong enough to infringe on somebody's First Amendment rights saying that, you know, in the future, at some point, I might not want to work for this guy. I don't now, but, you know, I don't like the guy. That's not enough. With respect to the Donley post, it's not disruptive just because they don't like what he has to say. I mean, there has to be some impact to the core operations. It's insubordinate. Well, there's no order to Mr. Donley to do anything. It's not insubordinate of anything. It's his concern regarding and I'm out of time. Go ahead. You can finish. It's his concern regarding the application of these policies to an employee that he doesn't like. Thank you, Your Honors. I want to ask you a question. Yes, Your Honor. I'm thinking just in terms of the way this case is being presented. I'm just envisioning, here's the chief. He has this code of conduct social media policy. More than likely, he has all his battalion chiefs. He tells them what this is. And it's their He doesn't voice his dissent then. He goes and violates the policy that he's supposed to be enforcing. Why is that not disruptive? I guess I would dispute that he violates the policy. I mean, I'm not sure if... Once he's told he's violating, once he's told it, then he just doesn't give up then either. The policy itself says that you're not insubordinate for failing to believe is illegal. I mean, if you read the letter of the policy... But isn't timing sort of important? If you get sort of an indication that something is not something you believe in, whether it's in a meeting or earlier time, that you wouldn't just go do the very act that violates it. You would voice your dissension in a kind of internal way to avoid disruption. That may have been an option, but I don't think that Mr. Buecher's failure to do that somehow moots the claim or somehow is his only avenue for redress. I hope this is not the kind of conduct that would be shown by any battalion chiefs or deputy chiefs and police officers or whomever when you have a policy within it. The way of venting their First Amendment rights is to go and violate the very policy or be reasonably interpreted to violate it. I guess you and I don't agree that he violated the policy, but more than that, the speech... I could agree that it could be reasonably interpreted that he violated it. And once he's told, he kind of knows it then that somebody thinks it is and that somebody happens to be the chief. That's not the test, though. This Court's made clear in Kirby... It's not the test for what? For disruption? Well, the fact that the chief believes that it violates the policy doesn't therefore mean he doesn't have a First Amendment right to say. It's only a fact to determine whether there's disruption. It's not a question of whether the chief believes it or not. The question is disruption within the department. That's why the special list is there. I think I got your point.
judges: Roger L. Gregory, James A. Wynn Jr., Stephanie D. Thacker